## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## NEWPORT NEWS DIVISION

| | |
|---|---|
| JANE DOE (C.P.J.), AN INDIVIDUAL, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO: |
| SHRIHARI LLC and HAMPTON SAI LLC, | |
| Defendants. | JURY TRIAL DEMANDED |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jane Doe (C.P.J.) files this Original Complaint against Defendants Shrihari LLC and Hampton SAI LLC, and would respectfully show the Court and jury as follows:

### SUMMARY

1.     Jane Doe (C.P.J.) brings this civil action under 18 U.S.C. § 1595(a) as a victim of sex trafficking of a child in violation of 18 U.S.C. § 1591. Plaintiff alleges she was trafficked at hotels in Hampton and Newport News, Virginia that were owned, operated, managed, and controlled by Defendants, and that Defendants knowingly benefited from participation in a venture that they knew or should have known engaged in sex trafficking.

2.     Sex trafficking is a public health crisis that has reached epidemic proportions in the United States. It is widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for traffickers and sex buyers.

3.     Since 2003, federal law has provided victims of trafficking a civil remedy at 18 U.S.C. § 1595, allowing victims to seek damages in federal court for trafficking violations, including sex trafficking prohibited by 18 U.S.C. § 1591.

1

4.     In 2008, Congress expanded the civil remedy to reach not only direct perpetrators, but also those who knowingly benefit financially (or by receiving anything of value) from participation in a venture that they knew or should have known engaged in trafficking.

5.     Jane Doe (C.P.J.) was a minor at the time of the trafficking, and she alleges Defendants derived financial benefit from and facilitated sex trafficking by providing venues where traffickers and sex buyers could exploit victims, including Jane Doe (C.P.J.), with minimal risk of detection or interruption. Jane Doe (C.P.J.) further alleges that Defendants enabled traffickers despite obvious and apparent indicators of sex trafficking occurring at these properties.

6.     Defendants had the opportunity to prevent the severe and permanent harm Jane Doe (C.P.J.) suffered. Instead, Defendants continued to profit from and facilitate the trafficking venture by renting rooms and providing hotel services under circumstances in which they knew or should have known that sex trafficking was occurring at the properties. Accordingly, Jane Doe (C.P.J.) brings this action for damages and attorneys' fees as authorized by federal law.

## PARTIES

7.     Plaintiff, Jane Doe (C.P.J.), is a resident of Texas. She may be contacted through her lead counsel, whose information is contained below.

8.     Jane Doe (C.P.J.) was born on December 17, 1997. She is an individual who is a victim of a violation of Chapter 77 of Title 18, including sex trafficking of a child in violation of 18 U.S.C. § 1591(a). At all relevant times, Jane Doe (C.P.J.) had not attained the age of eighteen (18) years and was caused to engage in commercial sex acts.

9.     The trafficking of Jane Doe (C.P.J.) occurred in or affected interstate commerce.

10.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (C.P.J.).

11.     During the relevant period, (a) the hotel located at 11829 Fishing Point Dr, Newport News, VA 23606 operated as a Days Inn (the "Newport News Property"), and (b) the hotel located at 1918 Coliseum Dr, Hampton, VA 23666 operated as a Days Inn (the "Hampton Property"). Collectively, the Newport News Property and the Hampton Property are referred to as the "Subject Hotels."

12.     Defendant Shrihari LLC ("Shrihari") is a Virginia limited liability company with its principal place of business in Newport News, Virginia. Shrihari can be served through its registered agent: Upendra Patel, 11829 Fishing Point Dr, Newport News, VA 23606. At all relevant times, Shrihari owned, operated, controlled, and managed the Newport News Property.

13.     Defendant Hampton SAI LLC ("Hampton SAI") is a Virginia limited liability company with its principal place of business in Henrico, Virginia. Hampton SAI can be served through its registered agent: Prashant Merchant, 3626 Autumn Chase Dr, Henrico, VA 23233. At all relevant times, Hampton SAI owned, operated, controlled, and managed the Hampton Property.

14.     Defendants Shrihari and Hampton SAI are referred to collectively as "Defendants."

## JURISDICTION AND VENUE

15.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Trafficking Victims Protection Act's civil remedy provision, 18 U.S.C. § 1595(a).

16.     This Court has personal jurisdiction over Defendants because each Defendant is organized under the laws of Virginia and/or conducts business in this District, and Plaintiff's claims arise from Defendants' acts and omissions in this District, including at the Subject Hotels in Hampton and Newport News, Virginia.

Case 4:25-cv-00169-AWA-RJK    Document 1    Filed 12/17/25    Page 4 of 24 PageID# 4

17.     Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including at the Subject Hotels.

<b><u>STATEMENT OF FACTS</u></b>

**I.     Jane Doe (C.P.J.) is a Survivor of Unlawful Sex Trafficking, While a Minor, at Hotels Owned, Operated, Managed, and Controlled by Defendants.**

18.     Jane Doe (C.P.J.) met her trafficker's associate in the summer of 2013, when she was just fifteen (15) years old. The associate introduced her to the trafficker, who groomed and manipulated Jane Doe (C.P.J.) into working for him. From the outset, the trafficker and his associate exercised strict control over Jane Doe (C.P.J.) and isolated her from outside support and even went so far as to brand her with the trafficker's name. During this time, Jane Doe (C.P.J.) was drugged, and when she refused to comply with her trafficker's demands, she was beaten.

19.     On numerous occasions, Jane Doe (C.P.J.) was trafficked at the Days Inn located at 11829 Fishing Point Dr, Newport News, VA 23606 ("Newport News Property"). During this time, Jane Doe (C.P.J.) was caused to engage in numerous commercial sex acts for her trafficker's financial benefit at the Newport News Property.

20.     On numerous occasions, Jane Doe (C.P.J.) was trafficked at the Days Inn located at 1918 Coliseum Dr, Hampton, VA 23666 ("Hampton Property"). During this time, Jane Doe (C.P.J.) was caused to engage in numerous commercial sex acts for her trafficker's financial benefit at the Hampton Property.

21.     The Newport News Property and Hampton Property will be referred to collectively as the "Subject Hotels."

4

22.     On June 25, 2014, Jane Doe (C.P.J.)'s trafficker was arrested in an FBI sting, and would go on to plead guilty to operating a business enterprise involving the illegal prostitution of several women, including a minor.

23.     Jane Doe (C.P.J.) was trafficked repeatedly at the Subject Hotels.

24.     Jane Doe (C.P.J.)'s sexual exploitation repeatedly occurred in rooms of the Subject Hotels. At the Subject Hotels, Jane Doe (C.P.J.) was harbored, maintained, and provided by her trafficker and others, and was caused to engage in commercial sex acts for her trafficker's financial benefit. Defendants facilitated and profited from this trafficking by renting rooms and providing hotel services at the Subject Hotels under circumstances indicative of sex trafficking.

25.     There were obvious signs that Jane Doe (C.P.J.) was being trafficked at the Subject Hotels such that Defendants knew or should have known that they were benefiting from and participating in a venture engaged in her sexual exploitation.

26.     Obvious indicators of Jane Doe (C.P.J.)'s trafficking at the Subject Hotels included that her trafficker rented rooms in cash on a daily basis at the front desk, repeatedly selecting rooms located in the back of the property, and then bringing Jane Doe (C.P.J.) inside only after obtaining the room key, while she waited in a vehicle. The trafficker also rented multiple rooms at the same time, including one room for himself and another nearby room for Jane Doe (C.P.J.) and two other women he was trafficking. Jane Doe (C.P.J.) and the other women were not allowed to interact with hotel staff. Housekeeping was kept out of the rooms, and linens and towels were exchanged through the door, with used items placed in a bag outside and clean items returned. There was constant heavy foot traffic in and out of the rooms involving adult men who were not hotel guests, who arrived and departed in short periods of time at a steady pace throughout the day. Jane Doe (C.P.J.) alone was forced to engage in commercial sex acts with approximately six to seven buyers

per day, in addition to the buyers who came to purchase commercial sex acts from the other women in the room.

27.    At all relevant times, the Subject Hotels operated as hotels providing lodging to the public in Hampton and Newport News, Virginia.

28.    At all relevant times, Defendants owned, operated, managed, and/or controlled the Subject Hotels and employed, supervised, and/or controlled the hotel staff who provided lodging and related services to guests, including Jane Doe (C.P.J.)'s trafficker.

29.    Plaintiff's trafficker repeatedly used the Subject Hotels because they provided privacy, ease of access, and a setting that enabled sex trafficking to occur with minimal interference.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

30.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of Jane Doe (C.P.J.) at the Subject Hotels.

31.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[1] For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[2] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[3] Hotels have been

---

[1] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*
[2] *See* Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.
[3] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

found to account for over 90 percent of places where commercial exploitation of children happens most often.[4]

32.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[5]

33.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[6]

34.     Widely recognized signs of sex trafficking, which can be observed by hotel staff and which Defendants were made aware of, include but are not limited to:

    a.  Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

    b.  Individuals showing signs of physical abuse, restraint, and/or confinement;

    c.  Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

---

[4] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).
[5] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .
[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

d.  Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.  Individuals lacking freedom of movement or are constantly monitored;

f.  Individuals avoiding eye contact and interaction with others;

g.  Individuals having no control over or possession of money or ID;

h.  Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

i.  Individuals having few or no personal items—such as no luggage or other bags;

j.  Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

k.  A group of girls appearing to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or use of large amounts of cash or pre-paid cards.[7]

35.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[8] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

36.    Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotels, when enacting and enforcing

---

[7] *Id.*
[8] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

policies and procedures applicable to those hotels, and when training, educating, and supervising the staff of those hotels.

37.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[9] It is also well understood, and specifically trained in hotel safety training courses, that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

38.     The definition of sex trafficking in the TVPRA under 18 U.S.C. § 1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[10]

39.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels, and when training, educating, and supervising the staff of those hotels.

40.     The most effective weapon against sexual exploitation and human trafficking is education and training.[11] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human
> trafficking due to its perceived anonymity. Traffickers believe they can go

---

[9] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[10] *Id.*
[11] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[12]

41.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[13] In reference to companies like Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

42.     Given the prevalence of human trafficking in hotels and the abundance of information about how owners, operators, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by facilitating unlawful sex trafficking.

43.     Defendants have failed, at all levels, to take appropriate action in response to their knowledge regarding human trafficking in their hotels. Instead, Defendants have continued financially benefiting from providing venues for the sexual exploitation of victims like Jane Doe (C.P.J.).

**A. Sex Trafficking Was Prevalent and Obvious at the Subject Hotels.**

44.     Defendants knew or should have known that sex trafficking was prevalent at the Subject Hotels.

---

[12] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[13] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

45.     Defendants knew or should have known that the Subject Hotels were located in areas with a known history of criminal activity, including reports of sex trafficking.

46.     Online reviews of the Newport News Property, which upon information and belief were available to and monitored by Shrihari, establish the nature of the Newport News Property's role as a venue for criminal activity, including sex trafficking, and reflect conditions that existed during and after Plaintiff's trafficking period:

    a.  A 2015 Google review of the Newport News Property states: "This hotel is very run down, very unkept, and dirty. The first night we stayed we were woken up at 1am by a prostitute fighting with cops and paramedics outside of our room - which went on for about 1.5 hrs. The second night our whole floor smelled like marijuana, which is obviously not something i enjoyed my kids breathing - a call to the front desk was met with "we can't do anything about it." I tried to speak with a manager on our check-out day and the lady behind the counter was extremely rude and told us there was no manager on duty. She tried to call the manager for 15 minutes and was unable to reach them… This place is a dump, I really regret staying here and it is very far from what i expected from a Days Inn hotel."[14]

    b.  A 2017 Google review of the Newport News Property states: "Nothing says relaxation like hookers and drug dealers. The place smelled like cat piss and cheap cigars. Front desk was fairly nice but acted as if they weren't surprised by us checking out early. Mr. Patel should be ashamed of this place. I have contacted the health department because there is no way it is up to code."[15]

    c.  A 2025 Expedia review of the Newport News Property states: "…The front desk is covered with bulletproof glass, need I say more?!?"[16]

    d.  A 2025 booking.com review of the Newport News Property states: "Strangers who look like they are on drugs & homeless outside & in asking me to lend them money

---

[14]https://www.google.com/travel/search?q=Days%20Inn%20by%20Wyndham%20Newport%20News%20City%20Center%20Oyster%20Point&g2lb=4965990%2C72317059%2C72414906%2C72471280%2C72485658%2C72560029%2C72573224%2C72647020%2C72686036%2C72803964%2C72882230%2C72958624%2C73059275%2C73064764%2C73107089%2C73169520%2C73192290%2C73198317&hl=en-US&gl=us&ssta=1&ts=CAEaRwopEicyJTB4ODliMDc4OTJjY2M3OTMwMToweGMyMzRlM2ViYTA3ZTVhYzYSGhIUCgcI6g8QAhgSEgcI6g8QAhgTGAEyAhAA&qs=CAEyFENnc0l4clg1ZzdyOXVXKckNBUkFCOAJCCQnGWn6g6-M0wkIJCcZafqDr4zTC&ap=ugEHcmV2aWV3cw&ictx=111&ved=0CAAQ5JsGahcKEwjgxq3eo7uRAxUAAAAAHQAAAAAQBA
[15] Id.
[16] https://www.expedia.com/Newport-News-Hotels-Days-Inn-By-Wyndham-Newport-News-City-Center-Oyster-Point.h17220.Hotel-Information?pwaDialog=product-reviews

People in & out all hours of the night and day Staff live there having their friends using the facilities Attitudes from staff People constantly asking for smokes People homeless druggies etc allowed access to the free breakfast"[17]

e.  A 2025 booking.com review of the Newport News Property states: "Everything the staff was completely rude and ghetto and doing secretive things with guests and use of drugs the breakfast everyday eggos was garage…elevator wasn't working properly but overall great area but the staff was a complete disaster…"[18]

47.     Online reviews of the Hampton Property, which upon information and belief were available to and monitored by Hampton SAI, establish the nature of the Hampton Property's role as a venue for criminal activity, including sex trafficking, and reflect conditions that existed during and after Plaintiff's trafficking period:

a.  A 2023 Expedia review of the Hampton Property states: "…there is no security past that point and anyone off the street have access to the property there were people milling about the property drug sales out in the open the property appears to be run down. We were surprised at this because we have been to others properties belonging to your organization upon noticing these things we immediately checked out we and found more suitable accommodations very very disappointed Wyndham needs to step it up. Very dissatisfied customer."[19]

b.  A 2024 Expedia review of the Hampton Property states: "…A couple argued, cursed each other out and kicked one another out all night next door to us so that was heard all night outside. I awoke at 5am to a man walking back and forward in front of my door cursing and rapping loudly. The place reminded me of a place one may take a prostitute for a quick night of fun or maybe a drug exchange. I knew something was wrong when the lobby doorr was locked and I had to speak to the receptionist through a slot in the window to check in and get my card. NEVER AGAIN!"[20]

c.  A 2025 Google Maps review of the Hampton Property states: "…The place reeked of smoke and there were clearly people using drugs on the property. It felt very unsafe, especially at night. We couldn't sleep at all — there was shouting, doors slamming, and loud noise until 3 AM. Honestly, it couldn't have been worse. Stay away if you value your health, safety, and peace of mind."[21]

---

[17] https://www.booking.com/reviews/us/hotel/days-inn-newport-news.html?aid=2440491&label=cht532js-10CA0o7AFCFWRheXMtaW5uLW5ld3BvcnQtbmV3c0gJWANosAKIAQGYATO4AQfIAQ3YAQPoAQH4AQGI AgGoAgG4Avb89skGwAIB0gIkZWVjMWU0ZjYtYzRjMS00ZDM4LWFmNmEtODk3ZDU4MTVjNzQx2AIB4A IB&sid=bbfb0d9523637ed4b4a0fa5d7512ee1f&r_lang=en&customer_type=total&order=score_asc
[18] *Id.*
[19] https://www.expedia.com/Newport-News-Hotels-Days-Inn-By-Wyndham-Hampton-Near-Coliseum-Convention-Center.h7033.Hotel-Information?discovery-landing-offers-overlay=discovery-landing-offers-overlay
[20] *Id.*
[21] https://maps.app.goo.gl/bq7dYFyLkRxNW2r57

    d.   A 2025 Google Maps review of the Hampton Property states: "This is one of the most disgusting uncomfortable upsetting experiences I've ever had. First and foremost someone went in my room when I was gone and stole my stuff. The hallways smell like pee there are drug addicts every where…"[22]

48.    Although the above reviews of the Subject Hotels post-date Jane Doe (C.P.J.)'s trafficking period, they describe the same types of conditions and red flags – drug activity, visible prostitution, noise, violence, and law enforcement activity – that Jane Doe (C.P.J.) experienced, demonstrating that sex trafficking and related criminal activity at the Subject Hotels were not an isolated occurrence unique to Jane Doe (C.P.J.)'s stays, but part of an ongoing and well-known pattern that persisted over time and, upon information and belief, continues to this day.

49.    Traffickers, including Jane Doe (C.P.J.)'s trafficker, repeatedly chose to use the Subject Hotels for their sex trafficking activity. As such, Defendants knew or should have known about the pervasive sex trafficking at the Subject Hotels based on obvious indicators of this activity.

50.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Hotels prior to Jane Doe (C.P.J.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their rooms at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their

---

[22] https://maps.app.goo.gl/C1MwHv2yCvqcCZ4U9

traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

51.    All knowledge from the staff at the Subject Hotels is imputed to Defendants. Defendants knew about this widespread and ongoing trafficking at the Subject Hotels, including the trafficking of Jane Doe (C.P.J.), through the direct observations of hotel staff, including management-level staff.

### B. All Defendants Knew Jane Doe (C.P.J.) was Being Trafficked at the Subject Hotels Because of the Apparent and Obvious "Red Flags" of Sex Trafficking.

52.    During the period that Jane Doe (C.P.J.) was trafficked at the Subject Hotels, it was apparent she was the victim of sex trafficking.

53.    Because it was known among the community of traffickers that staff at the Subject Hotels turned a blind eye to sex trafficking, Jane Doe (C.P.J.)'s trafficker made little or no effort to disguise his role or actions.

54.    At the Newport News Property, Jane Doe (C.P.J.) exhibited numerous obvious signs of trafficking, including:

  a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards, including rooms rented and extended on a daily basis at the front desk using cash;

  b. Other women were trafficked at the same hotel at the same time as Jane Doe (C.P.J.), including two who were trafficked in the same room as Jane Doe (C.P.J.), while the trafficker simultaneously rented a separate nearby room for himself;

  c. Even though Jane Doe (C.P.J.) and her trafficker would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

  d. Rooms were repeatedly selected in the back of the property, away from public view;

  e. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services, and instead, used linens and towels were placed in a bag outside the door and exchanged for clean items without housekeeping entering the room;

      f.  There was heavy foot traffic in and out of Jane Doe (C.P.J.)'s room involving men who were not hotel guests;

      g.  Jane Doe (C.P.J.) had approximately six to seven johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

      h.  Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

55.    Upon information and belief, multiple employees at the Newport News Property, including management-level employees, observed and/or were made aware of these signs of trafficking while acting within the scope and course of their employment.

56.    At the Hampton Property, Jane Doe (C.P.J.) exhibited numerous obvious signs of trafficking, including:

      a.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards, including rooms rented and extended on a daily basis at the front desk using cash;

      b.  Other women were trafficked at the same hotel at the same time as Jane Doe (C.P.J.), including two who were trafficked in the same room as Jane Doe (C.P.J.), while the trafficker simultaneously rented a separate nearby room for himself;

      c.  Even though Jane Doe (C.P.J.) and her trafficker would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

      d.  Rooms were repeatedly selected in the back of the property, away from public view;

      e.  Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services, and instead, used linens and towels were placed in a bag outside the door and exchanged for clean items without housekeeping entering the room;

      f.  There was heavy foot traffic in and out of Jane Doe (C.P.J.)'s room involving men who were not hotel guests;

      g.  Jane Doe (C.P.J.) had approximately six to seven johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

      h.  Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

57.    Upon information and belief, multiple employees at the Hampton Property, including management-level employees, observed and/or were made aware of these signs of trafficking while acting within the scope and course of their employment.

58.    As such, Defendants knew or should have known that Jane Doe (C.P.J.) was being trafficked at the Subject Hotels.

59.    Given these obvious signs, Defendants knew or should have known that Jane Doe (C.P.J.) was being trafficked, yet failed to implement and follow reasonable policies, protocols, and practices to identify and report suspected sex trafficking and to deter traffickers from using the Subject Hotels.

**III.    All Defendants Actively Facilitated Sex Trafficking at the Subject Hotels, Including Jane Doe (C.P.J.)'s Trafficking.**

60.    Defendants had both actual and constructive knowledge that sex trafficking was occurring at the Subject Hotels, and Jane Doe (C.P.J.)'s trafficking was the direct result of Defendants' acts and omissions that facilitated her exploitation at the Subject Hotels.

**A. Shrihari Facilitated the Trafficking of Jane Doe (C.P.J.) at the Newport News Property.**

61.    Shrihari is responsible for the acts, omissions, and knowledge of all employees of the Newport News Property when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Shrihari ratified these acts and omissions, and because Shrihari failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Shrihari, of sex trafficking occurring at the Newport News Property.

62.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Newport News Property, Shrihari continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe (C.P.J.).

63.     Shrihari knew or was willfully blind to the fact that Jane Doe (C.P.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.P.J.)'s sexual exploitation.

64.     Shrihari facilitated Jane Doe (C.P.J.)'s trafficking at the Newport News Property through numerous acts and omissions, including:

   a. Permitting Jane Doe (C.P.J.), a minor, to be on the property without a parent or legal guardian, and without any adult exhibiting indicia of lawful custody, guardianship, or responsible supervision;

   b. Allowing traffickers to reserve rooms while maintaining relative anonymity and non-traceability;

   c. Failing to report suspected trafficking activity according to reasonable practices, industry standards, and/or applicable policies;

   d. Despite seeing obvious signs of distress, failing to take any steps to inquire about the welfare of Jane Doe (C.P.J.);

   e. Continuing to rent rooms to traffickers, including Jane Doe (C.P.J.)'s trafficker, despite the observed signs of trafficking;

   f. Failing to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Newport News Property;

   g. Enabling traffickers to access ancillary services that supported trafficking activities, such as furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

   h. Providing the free Wi-Fi that Jane Doe (C.P.J.)'s trafficker used to advertise and solicit buyers to purchase commercial sex delivered by Jane Doe (C.P.J.) at the Newport News Property.

**B. Hampton SAI Facilitated the Trafficking of Jane Doe (C.P.J.) at the Hampton Property.**

65.     Hampton SAI is responsible for the acts, omissions, and knowledge of all employees of the Hampton Property when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Hampton SAI ratified these acts and omissions, and because Hampton SAI failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Hampton SAI, of sex trafficking occurring at the Hampton Property.

66.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Hampton Property, Hampton SAI continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe (C.P.J.).

67.     Hampton SAI knew or was willfully blind to the fact that Jane Doe (C.P.J.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.P.J.)'s sexual exploitation.

68.     Hampton SAI facilitated Jane Doe (C.P.J.)'s trafficking at the Hampton Property through numerous acts and omissions, including:

    a.  Permitting Jane Doe (C.P.J.), a minor, to be on the property without a parent or legal guardian, and without any adult exhibiting indicia of lawful custody, guardianship, or responsible supervision;

    b.  Allowing traffickers to reserve rooms while maintaining relative anonymity and non-traceability;

    c.  Failing to report suspected trafficking activity according to reasonable practices, industry standards, and/or applicable policies;

    d.  Despite seeing obvious signs of distress, failing to take any steps to inquire about the welfare of Jane Doe (C.P.J.);

    e.  Continuing to rent rooms to traffickers, including Jane Doe (C.P.J.)'s trafficker, despite the observed signs of trafficking;

    f.  Failing to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Hampton Property;

g. Enabling traffickers to access ancillary services that supported trafficking activities, such as furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

h. Providing the free Wi-Fi that Jane Doe (C.P.J.)'s trafficker used to advertise and solicit buyers to purchase commercial sex delivered by Jane Doe (C.P.J.) at the Hampton Property.

**C. Defendants' Venture at the Subject Hotels.**

69. Defendants profited from rooms rented to traffickers and sex buyers, including Jane Doe (C.P.J.)'s trafficker, including from room rental revenue and revenue generated from other hotel services.

70. Through the acts and omissions described above, Defendants participated in a venture with sex traffickers operating at the Subject Hotels, including Plaintiff's trafficker (the "Venture").

71. Defendants participated in the Venture by repeatedly renting rooms and providing related services to traffickers after they knew or should have known that rooms were being used to facilitate sex trafficking, including the trafficking of Jane Doe (C.P.J.).

72. The Venture involved a mutual pursuit of financial benefit: traffickers rented hotel rooms to facilitate sex trafficking and generate revenue from commercial sex, and Defendants generated revenue by renting rooms and providing hotel services at the Subject Hotels.

73. On information and belief, the Venture and pattern of dealing persisted because sex traffickers, including Jane Doe (C.P.J.)'s trafficker, frequently used the Subject Hotels for trafficking activity knowing that staff would not meaningfully intervene, due to the acts and omissions of Defendants that created and maintained a favorable environment for sex trafficking to occur at the Subject Hotels.

74.    Defendants participated in the Venture by operating the Subject Hotels and facilitating room rentals and related services under circumstances consistent with trafficking.

75.    Defendants participated in the Venture by continuing to rent rooms and provide hotel services to traffickers, including Jane Doe (C.P.J.)'s trafficker, under circumstances in which they knew or should have known that victims like Jane Doe (C.P.J.) were being subjected to sex trafficking at the Subject Hotels. They also continued operating the Subject Hotels in a manner that they knew or should have known would encourage traffickers to select the Subject Hotels as venues for their illegal activities.

76.    Defendants provided traffickers with hotel rooms and hotel services at the Subject Hotels that enabled traffickers to commit sex trafficking acts at the properties, and provided the cover of a legitimate business as a venue where traffickers could profit from sexual exploitation with a reduced risk of disruption. This is evidenced by, among other things:

   a.  The population of traffickers, including Jane Doe (C.P.J.)'s trafficker, were familiar to staff at the Subject Hotels;

   b.  These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from staff at the Subject Hotels and, instead, made requests that facilitated trafficking activity without concern for detection or interference;

   c.  Defendants allowed traffickers to minimize traceability to law enforcement by accepting cash payments and permitting repeated rentals and other practices that reduced accountability and transparency; and

   d.  Defendants provided services and amenities requested by traffickers, including but not limited to internet access and excessive towels and linens, in a manner consistent with facilitating trafficking activity at the Subject Hotels. On information and belief, traffickers and buyers used the Subject Hotels' internet and Wi-Fi services to advertise and solicit commercial sex, including the commercial sexual exploitation of Jane Doe (C.P.J.), and Defendants benefited from the continued provision of those services and the associated data. Defendants also knowingly benefited from allowing the ongoing use of the Subject Hotels' internet and Wi-Fi services to access websites and online platforms commonly used to advertise

commercial sex, knowing that restricting access would reduce the regular and profitable patronage of traffickers and buyers.

77.     The criminal traffickers operating at the Subject Hotels as part of the Venture committed acts of sex trafficking in violation of 18 U.S.C. § 1591 as to victims including Jane Doe (C.P.J.).

78.     If Defendants had not continued participating in a venture engaged in acts in violation of Chapter 77, including violations of 18 U.S.C. § 1591, they would not have received a benefit from Jane Doe (C.P.J.)'s trafficking at the Subject Hotels.

**CAUSE OF ACTION – SEX TRAFFICKING UNDER THE TVPRA**

**I.     Beneficiary Liability under § 1595(a) of the TVPRA.**

79.     Jane Doe (C.P.J.) is an individual who is a victim of a violation of Chapter 77 of Title 18, including sex trafficking in violation of 18 U.S.C. § 1591, and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against any person who knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known has engaged in an act in violation of Chapter 77.

80.     All Defendants are liable within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefited, financially and/or by receiving anything of value, from its participation in a venture that each Defendant knew or should have known was engaged in acts of sex trafficking, including the trafficking of Jane Doe (C.P.J.), in violation of 18 U.S.C. § 1591.

81.     The Venture**:** Through acts and omissions more fully described throughout this Complaint, each Defendant knowingly benefited from participation in a venture with sex traffickers, including Jane Doe (C.P.J.)'s trafficker. Each Defendant is liable under 18 U.S.C. § 1595(a) based on its participation in the Venture as follows:

a.  The Venture resulted when Defendants developed and maintained an ongoing pattern of dealing with sex traffickers at the Subject Hotels by repeatedly renting rooms and providing related services under circumstances in which each Defendant knew or should have known the Subject Hotels were being used to facilitate acts of sex trafficking in violation of 18 U.S.C. § 1591, including the trafficking of Jane Doe (C.P.J.).

b.  The Venture was engaged in acts in violation of Chapter 77, including 18 U.S.C. § 1591, through the conduct of traffickers who repeatedly exploited victims, including Jane Doe (C.P.J.), in rooms at the Subject Hotels.

c.  Each Defendant knew or should have known that the Venture was engaged in acts in violation of Chapter 77, including acts of sex trafficking in violation of 18 U.S.C. § 1591.

d.  Each participant in the Venture pursued the purpose of generating revenue through this ongoing pattern of dealing: traffickers rented rooms to facilitate sex trafficking and generate revenue from commercial sex, and each Defendant received a financial benefit every time a trafficker rented a room and purchased hotel services.

e.  Each Defendant participated in the Venture by continuing to rent rooms and provide hotel services to traffickers, creating and maintaining a favorable environment for trafficking, and providing a venue where traffickers could continue their sexual exploitation with a reduced risk of detection and disruption, while ignoring or disregarding obvious indicators of trafficking (including indicators of Jane Doe (C.P.J.)'s trafficking) described above. This participation included continuing to provide hotel services used to facilitate trafficking, including internet and Wi-Fi services used to advertise and solicit commercial sex at the Subject Hotels, as described above.

82.    The venture in which each Defendant participated was a direct, producing, and proximate cause of the injuries and damages to Jane Doe (C.P.J.).

83.    As alleged above, Defendants are directly liable to Jane Doe (C.P.J.) under 18 U.S.C. § 1595(a) as beneficiaries for knowingly benefiting from participation in a venture that they knew or should have known engaged in sex trafficking.

84.    Further, each Defendant's failure to implement, require, and/or enforce adequate anti-trafficking training, supervision, and reporting practices at the Subject Hotels contributed to

the conditions that allowed trafficking to continue and supports that Defendants knew or should have known that sex trafficking was occurring at the Subject Hotels.

## **DAMAGES**

85.     As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1595(a), Jane Doe (C.P.J.) has sustained damages.

86.     Defendants are liable for all past and future damages sustained by Jane Doe (C.P.J.) as a result of Defendants' conduct.

87.     Jane Doe (C.P.J.) seeks to recover damages, including but not limited to the following past and future losses:

     a.  Compensatory damages in an amount to be determined at trial;

     b.  Consequential economic losses and other out-of-pocket expenses reasonably incurred as a result of the trafficking and its aftermath;

     c.  Mental anguish, emotional distress, humiliation, fear, anxiety, and trauma-related harms;

     d.  Lost earnings and loss of future earning capacity;

     e.  Past and future medical, hospital, counseling, therapy, psychiatric, and other healthcare expenses;

     f.  Past and future life care expenses and other necessary support services;

     g.  Physical pain and suffering;

     h.  Physical impairment and/or disability;

     i.  Emotional and psychological impairment;

     j.  Punitive (exemplary) damages, as permitted by law;

     k.  Reasonable attorneys' fees as authorized by 18 U.S.C. § 1595(a);

     l.  Taxable costs of court and litigation expenses, as permitted by law; and

     m.  Pre-judgment and post-judgment interest as allowed by law.

**JURY DEMAND**

88.    Jane Doe (C.P.J.) demands a jury trial on all issues.

**REQUEST FOR RELIEF**

WHEREFORE, Jane Doe (C.P.J.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (C.P.J.) against all Defendants for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, pre-judgment interest, post-judgment interest, and such other and further relief to which Jane Doe (C.P.J.) may, in law or in equity, show herself to be justly entitled.

Dated:  December 17, 2025                    Respectfully submitted,

/s/ Zev H. Antell
Zev H. Antell (VSB No. 74634)
Samantha R. Galina (VSB No. 96981)
Attorneys for Plaintiff
Butler Curwood, PLC
140 Virginia Street, Ste. 302
Richmond, VA 23219
Telephone: (804) 648-4848
Fax: (804) 237-0413
Email: zev@butlercurwood.com
          samantha@butlercurwood.com

Ramsey S. Al-Azem*
Sico Hoelscher Harris LLP
3 Riverway, Suite 1910
Houston, Texas 77056
Telephone: (346) 250-2217
ralazem@shhlaw.com

*Pro hac vice application forthcoming

**ATTORNEYS FOR PLAINTIFF**

24